# United States Court of Appeals for the Federal Circuit

---

**JACOB JOHNSON,**
*Petitioner*

**v.**

**DEPARTMENT OF THE AIR FORCE,**
*Respondent*

---

2021-1579

---

Petition for review of an arbitrator's decision in No. 20115-01709 by Thomas A. Cipolla.

---

Decided: September 26, 2022

---

ERIN LYNN MARTINEZ, Martinez & Martinez, PLLC, El Paso, TX, argued for petitioner.

BRENDAN DAVID JORDAN, Civil Division, Commercial Litigation Branch, United States Department of Justice, Washington, DC, argued for respondent. Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., TARA K. HOGAN.

---

Before TARANTO, CHEN, and CUNNINGHAM, *Circuit Judges.*

CUNNINGHAM, *Circuit Judge.*

The Department of the Air Force fired Jacob Johnson after he failed a random drug test. Mr. Johnson now petitions this court to review an arbitrator's decision upholding his termination. We conclude that the Air Force's deciding officer violated Mr. Johnson's right to due process by engaging in *ex parte* communications about Mr. Johnson's case. As explained below, we reverse and remand for further proceedings.

## I. BACKGROUND

Mr. Johnson worked as a firefighter at Dyess Air Force Base from 2017 to 2019. App. 217, 229. Around March 2018, Mr. Johnson's mother came to live with Mr. Johnson and his family. App. 42. She was then taking around thirteen pills to treat various health issues. App. 45. Around the same time, Mr. Johnson was also taking "seven or eight" pills. *Id.*; *see also* App. 227–28 (Mr. Johnson's prescription history for 2018).

As a condition of his employment, Mr. Johnson was subject to random drug testing because the Air Force considered his position to be "sufficiently critical to the Air Force mission or to the protection of public safety." App. 244–45. The Air Force selected Mr. Johnson for a drug test on October 30, 2018. Suppl. App. 121. He tested positive for oxycodone and oxymorphone. *Id.* Shortly after, Mr. Johnson informed his supervisor, Chief Gregory Ranard, of the positive drug test and his belief that he had accidentally taken one of his mother's pills instead of his own prescribed medication. App. 29, 50, 100.

Chief Ranard proposed that Mr. Johnson be fired. App. 99–100. In a letter to Mr. Johnson, he stated that the Medical Review Officer found that "there was no legitimate medical explanation for the positive drug results." App. 99. Chief Ranard also wrote that being "under the influence of Oxycodone could impair [Mr. Johnson's] ability to perform [his] duties safely." *Id.*

The proposal to terminate Mr. Johnson was then referred to the deciding officer, Lieutenant Colonel Charles R. Fletcher. App. 100. On May 30, 2019, Lt. Col. Fletcher fired Mr. Johnson. App. 229. Explaining his decision, Lt. Col. Fletcher wrote that he could not "risk the possibility of [Mr. Johnson] coming to work again under the influence of illicit drugs." *Id.*

Mr. Johnson proceeded to challenge his removal under his Labor Management Agreement's grievance procedures. App. 233. At the arbitration hearing that followed, Lt. Col. Fletcher testified that he "just [didn't] believe" that Mr. Johnson accidentally took his mother's pill. App. 32. When asked whether Mr. Johnson's "lack of candor was a major part of" his decision to terminate Mr. Johnson, Lt. Col. Fletcher responded, "[a]bsolutely." *Id.* Lt. Col. Fletcher then described how he had spoken to two family members about Mr. Johnson's case:

> You know, I consult advisors and I make decisions. When I heard [Mr. Johnson's explanation], I wanted to make sure I consulted probably my number one advisor, my wife, which is—she's a registered nurse, and I just wanted to make sure I wasn't off. And I spoke to my brother-in-law, who's a nurse practitioner, and they confirmed that the likelihood of that happening is slim to none.

*Id.* On cross-examination, he further testified about consulting his family members:

> Q. And you also said that you consulted with your wife and your brother-in-law. Correct?
>
> A. Well, as far as the inadvertently taking someone else's pill, yes, I did talk to them about that.
>
> Q. And their opinion was that Mr. Johnson was not being truthful.
>
> A. No, their opinion was it's low probability of that happening.

App. 35.

In the end, the arbitrator denied Mr. Johnson's grievance and affirmed his termination "for having a positive test result for the metabolites of OxyContin." App. 10. The arbitrator concluded that Mr. Johnson's explanation of his positive drug test was "so fantastic it is difficult to give it credence." *Id.* He also found that Mr. Johnson's job "involve[d] the safety of others and the security of the installation" and that a positive drug test "is a powerful indicator of a possible problem and potential liability down the road." App. 9. In response to Mr. Johnson's due process argument, the arbitrator simply stated that he found "no convincing evidence that [Mr. Johnson] was denied due process in being able to present any and all matters in his defense." App. 10. Thus, the arbitrator concluded, the Air Force "was within its rights to remove [Mr. Johnson] from his position for having a positive test result." *Id.*

Mr. Johnson appeals. Under 28 U.S.C. § 1295(a)(9), we have jurisdiction over an appeal filed pursuant to 5 U.S.C. §§ 7121(f) and 7703(b)(1).

## II. DISCUSSION

### A. Standard of Review

"We review an arbitrator's decision under the same standard of review that is applied to decisions from the Merit Systems Protection Board." *Appleberry v. Dep't of Homeland Sec.*, 793 F.3d 1291, 1295 (Fed. Cir. 2015). Under this standard, "we must affirm the decision of the arbitrator unless it is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." *Id.* "This standard of review contemplates de novo review of questions of law." *Id.* "We must reverse an arbitrator's decision if it is not in accordance with the requirements of the Due Process Clause of the Fifth Amendment or any other constitutional

provision." *Boss v. Dep't of Homeland Sec.*, 908 F.3d 1278, 1280 (Fed. Cir. 2018) (brackets omitted).

## B.   Due Process

Mr. Johnson argues that the Air Force's termination proceedings violated his right to due process. *See, e.g.*, Pet'r's Br. 13–24, 27–32, 34.  We agree.

The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  There are two steps to evaluate whether a party has been deprived of property without due process.    First, we determine "whether the litigant has a protected property interest." *Edwards v. Shinseki*, 582 F.3d 1351, 1355 (Fed. Cir. 2009). If we conclude that the litigant has such a protected property interest, then we must ask "what process is due." *Id.*

### 1.   Property Interest

Mr. Johnson's "federal constitutional due process claim depends on his having a property right in continued employment." *Stone v. Fed. Deposit Ins. Corp.*, 179 F.3d 1368, 1374 (Fed. Cir. 1999).  Mr. Johnson asserts that he has a property interest in his job as a firefighter because he was a "non-probationary, tenured employee."  Pet'r's Br. 33; *see* App. 215 (career report stating that Mr. Johnson was part of "Permanent – Tenure Group 1").  The Air Force does not argue to the contrary.  *See, e.g.*, Resp't's Br. 15.  Because public employees have a property interest in continued employment where the government gives them "assurances of continued employment or conditions dismissal only for specific reasons," we agree that Mr. Johnson had a property interest in continued employment.  *See Stone*, 179 F.3d at 1374.  We next turn to what process he was due.

### 2.   *Ex Parte* Communications

Mr. Johnson argues that Lt. Col. Fletcher's *ex parte* communications with his wife and brother-in-law deprived Mr. Johnson of his right to due process.  Pet'r's Br. 27–32.

Although not every *ex parte* communication is impermissible, "*ex parte* communications that introduce new and material information to the deciding official will violate the due process guarantee of notice." *Stone*, 179 F.3d at 1377. To determine whether information is new and material, we consider:

> (1) "whether the *ex parte* communication merely introduces 'cumulative' information or new information;"
> (2) "whether the employee knew of the error and had a chance to respond to it;" and
> (3) "whether the *ex parte* communications were of the type likely to result in undue pressure upon the deciding official to rule in a particular manner."

*Id.* "Ultimately, the inquiry . . . is whether the *ex parte* communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." *Id.* When "a procedural due process violation has occurred because of *ex parte* communications, such a violation is not subject to the harmless error test." *Id.* "The concept of procedural fairness is the ultimate focus of the *Stone* inquiry . . . ." *Boss*, 908 F.3d at 1282.

After reviewing the evidence in the record, we conclude that the arbitrator erred in finding no violation of Mr. Johnson's right to due process. The first *Stone* factor weighs in favor of a due process violation because it is apparent that Lt. Col. Fletcher received new—not cumulative—information from his sister and brother-in-law. Namely, he received the opinion of two medical professionals that the possibility that Mr. Johnson accidentally took his mother's pill was "slim to none." App. 32.

Although the Air Force urges us to follow *Blank v. Department of the Army*, 247 F.3d 1225 (Fed. Cir. 2001), Resp't's Br. 42, that case is distinguishable. In *Blank*, we

held that "[i]nvestigatory interviews and communications that do no more than confirm or clarify pending charges do not introduce new and material information." 247 F.3d at 1229. There, the deciding officer "interviewed various agency employees merely to confirm and clarify information that was already contained in the record." *Id.* Here, by contrast, Lt. Col. Fletcher obtained new information that two medical professionals believed Mr. Johnson's explanation to be highly unlikely. In other words, when Lt. Col. Fletcher's relatives allegedly "confirmed" that the chances of Mr. Johnson taking his mother's pill were "slim to none," App. 32, they were not confirming information in the record; rather, they were providing new opinions on the evidence.

We also reject the Air Force's argument that the *ex parte* communications were permissible because they did not change Lt. Col. Fletcher's "existing understanding" of Mr. Johnson's explanation as not being credible. *See* Resp't's Br. 42–43. A deciding officer may violate an employee's due process rights even if the deciding officer states that he "would have concluded that the employee should be removed whether or not he had received the ex parte communications." *Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1280 (Fed. Cir. 2011) (brackets omitted) (quoting *Stone*, 179 F.3d at 1373). We do not ask whether the *ex parte* communications constituted harmless error. *Stone*, 179 F.3d at 1377. Once Lt. Col. Fletcher had received these comments about Mr. Johnson, he had to give Mr. Johnson an opportunity to respond to them before reaching a decision.

The remaining *Stone* factors similarly weigh in favor of concluding that the *ex parte* communications introduced new and material information. The Air Force acknowledges that Mr. Johnson learned of Lt. Col. Fletcher's *ex parte* communications only during the arbitration hearing, which occurred after Mr. Johnson's removal was final. Resp't's Br. 42; *see also* App. 2 (showing arbitration hearing

occurred on September 10, 2020, and Mr. Johnson's removal was effective May 30, 2019).  Mr. Johnson did not have a chance to respond to comments that Lt. Col. Fletcher's relatives made before he was terminated.  And Lt. Col. Fletcher made clear that the communications at issue were material, bearing on the central issue of whether to credit Mr. Johnson's explanation of the test results and coming from medical professionals.  *See* App. 32.  We need not decide whether those facts themselves suffice to find a due process violation or to find, under *Stone*'s third factor, that "the *ex parte* communications were of the type likely to result in undue pressure upon" Lt. Col. Fletcher.  *See Stone*, 179 F.3d at 1377.  In this case, there is additional reason to so find.  Familial bonds are often strong and intimate, making family members arguably the most influential people in anyone's life.  Indeed, Lt. Col. Fletcher described his wife as his "number one advisor." App. 32.  It is "constitutionally impermissible to allow a deciding official to receive additional material information that may undermine the objectivity required to protect the fairness of the process."  *Stone*, 179 F.3d at 1376.  Once Lt. Col. Fletcher had received the opinion of two family members—who are also medical professionals—that Mr. Johnson's explanation was not credible, he had to at least afford Mr. Johnson a chance to respond to maintain the objectivity that due process demands.

Having concluded that Lt. Col. Fletcher's *ex parte* communications violated Mr. Johnson's right to due process, we are left to decide the remedy.  Where "a serious procedural curtailment mars an adverse personnel action which deprives the employee of pay, the court has regularly taken the position that the defect divests the removal (or demotion) of legality, leaving the employee on the rolls of the employing agency and entitled to his pay until proper procedural steps are taken toward removing or disciplining him."  *Id.* at 1377.  The goal of cancellation of an employee's termination is "to place the employee as nearly as possible in the *status quo ante*."  *Kerr v. Nat'l Endowment for the*

*Arts*, 726 F.2d 730, 733 (Fed. Cir. 1984). Because the parties have not briefed the remedy due to Mr. Johnson, we leave it for the arbitrator to determine on remand the proper remedy for Mr. Johnson in view of these guidelines. If the Air Force continues to believe that Mr. Johnson should be removed, however, it can institute an "entirely new" and "constitutionally correct" procedure to remove him.[1] *Ward*, 634 F.3d at 1279 (citing *Stone*, 179 F.3d at 1377).

## III. CONCLUSION

We need not address Mr. Johnson's remaining arguments because the violation of his due process rights is a sufficient basis for reversal. *See Boss*, 908 F.3d at 1280. For the reasons above, we reverse the arbitrator's decision upholding Mr. Johnson's removal and remand to the arbitrator for further proceedings.

**REVERSED AND REMANDED**

COSTS

Costs to Petitioner.

---

[1]   Our decision turns solely on the violation of Mr. Johnson's due process rights. We do not express an opinion on whether the Air Force can place Mr. Johnson on notice leave or otherwise reassign him in accordance with Air Force regulations while initiating new removal proceedings. *See* 5 U.S.C. § 6329b; *cf. Paulic v. Dep't of the Army*, No. PH–0752–14–0606–I–1, 2015 WL 502971, at ¶ 14 n.7 (M.S.P.B. Feb. 6, 2015) (declining to find whether employee may be placed on leave following correction of removal).